22-2301(L)
*Attestor Master Value Fund LP v. Republic of Argentina*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2023
Argued: February 2, 2024
Decided: August 21, 2024

Nos. 22-2301(L), 22-2198, 22-2231, 22-2274,
22-2282, 22-2295, 22-2296, 22-2312, 22-2313,
22-2316, 22-2325, 22-2328, 22-2330, 22-2331,
22-2332, 23-516(L), 23-524, 23-528, 23-538,
23-539, 23-551, 23-552, 23-553, 23-554, 23-
555, 23-556, 23-558, 23-559, 23-560, 23-564

---

ATTESTOR MASTER VALUE FUND LP, TRINITY
INVESTMENTS LIMITED, BISON BEE LLC, BYBROOK
CAPITAL MASTER FUND LP, BYBROOK CAPITAL
HAZELTON MASTER FUND LP, WHITE HAWTHORNE,
LLC, WHITE HAWTHRONE II, LLC,

*Plaintiffs-Appellees,*

*v.*

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

---

Appeals from the United States District Court
for the Southern District of New York
Nos. 14-cv-5849, 14-cv-10016, 18-cv-3446, 15-
cv-2369, 15-cv-7367, 16-cv-1192, 21-cv-2060, 16-
cv-1042, 15-cv-1588, 15-cv-5886, 15-cv-2611, 15-
cv-9982, 16-cv-1436, 15-cv-4767, 15-cv-9601, 14-
cv-5849, 18-cv-3446, 15-cv-2369, 15-cv-7367, 16-
cv-1192, 21-cv-2060, 14-cv-10016, 15-cv-1588,
15-cv-2611, 15-cv-5886, 15-cv-9982, 16-cv-1436,
15-cv-4767, 15-cv-9601 & 16-cv-1042,
Loretta A. Preska, *Judge*.

———————————————

Before:          LEVAL, PARK, and LEE, *Circuit Judge*s.

In the early 1990s, the Republic of Argentina issued collateralized bonds as part of a sovereign-debt-relief plan organized by then U.S. Treasury Secretary Nicholas F. Brady. Argentina kept reversionary interests in the collateral, allowing it to regain possession of the collateral if it paid off the bonds in full.

But in 2001, Argentina defaulted on the bonds. Two decades later, holders of other defaulted Argentine bonds ("Appellees") tried to attach the reversionary interests to satisfy judgments stemming from Argentina's default on their bonds. Although the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-11, generally protects the property of foreign sovereigns from attachment, Appellees argued that the reversionary interests fell under an exception to that rule because Argentina had used them for commercial activity in the United States.

2

The district court granted the attachment, and Argentina appealed. During that appeal, the collateralized bonds matured, and the district court granted turnover of the reversionary interests to Appellees. Argentina appealed again, leading to this consolidated appeal.

We affirm the district court's attachment orders because Argentina's reversionary interests are not protected by the Foreign Sovereign Immunities Act. Argentina used the interests in commercial activity in the United States, rendering them subject to attachment. And Argentina's arguments that its attached assets are not amenable to turnover under New York law are meritless, so we affirm the turnover order too. Finally, the reasons for sealing this case are no longer compelling, so we order the parties to resubmit their briefs and appendices within thirty days with narrow redactions that comply with this Court's orders.

We **AFFIRM** the orders of the district court, **DENY** the motion to supplement the record, and **GRANT** the motion to limit the scope of sealing.

————

CARMINE D. BOCCUZZI, JR. (Allison Kim, Abigail K. Gotter-Nugent, Rebecca D. Rubin, Rathna J. Ramamurthi, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY & Washington, DC, *for Defendant-Appellant*.

JOHN F. BASH (Dennis H. Hranitzky, Alex H. Loomis, Kevin S. Reed, *on the brief*), Quinn Emanuel Urquhart & Sullivan, Austin, TX, Salt Lake City, UT, Boston, MA & New York, NY, *for Plaintiffs-Appellees*.

————

PARK, *Circuit Judge*:

In the early 1990s, the Republic of Argentina issued collateralized bonds as part of a sovereign-debt-relief plan organized by then U.S. Treasury Secretary Nicholas F. Brady. Argentina kept reversionary interests in the collateral, allowing it to regain possession of the collateral if it paid off the bonds in full.

But in 2001, Argentina defaulted on the bonds. Two decades later, holders of other defaulted Argentine bonds ("Appellees") tried to attach the reversionary interests to satisfy judgments stemming from Argentina's default on their bonds. Although the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-11, generally protects the property of foreign sovereigns from attachment, Appellees argued that the reversionary interests fell under an exception to that rule because Argentina had used them for commercial activity in the United States.

The district court granted the attachment, and Argentina appealed. During that appeal, the collateralized bonds matured, and the district court granted turnover of the reversionary interests to Appellees. Argentina appealed again, leading to this consolidated appeal.

We affirm the district court's attachment orders because Argentina's reversionary interests are not protected by the Foreign Sovereign Immunities Act. Argentina used the interests in commercial activity in the United States, rendering them subject to attachment. And Argentina's arguments that its attached assets are not amenable to turnover under New York law are meritless, so we

4

affirm the turnover order too.  Finally, the reasons for sealing this case are no longer compelling, so we order the parties to resubmit their briefs and appendices within thirty days with narrow redactions that comply with this Court's orders.

We affirm the orders of the district court, deny the motion to supplement the record, and grant the motion to limit the scope of sealing.

## I. BACKGROUND

A.      Factual Background

Appellees are seven investment funds[1] that purchased Argentine bonds issued in 1994.  They became pre- and post-judgment creditors after Argentina defaulted on $400 million in bonds in 2001.  To satisfy those judgments and claims, they sought to attach assets in the United States belonging to Argentina, including certain reversionary interests Argentina held in collateral that it used to back an earlier bond issuance.  We begin by explaining the creation and nature of those reversionary interests.

1.      *Argentina's Debt Crisis and the Brady Plan*

Argentina renegotiated much of its debt in the early 1990s under a debt-relief program known as the Brady Plan, instituted by then Treasury Secretary Nicholas F. Brady in response to the Latin American debt crises of the 1980s.  The plan involved an exchange of

---

[1] Attestor Master Value Fund LP, Trinity Investments Limited, Bison Bee LLC, Bybrook Capital Master Fund LP, Bybrook Capital Hazelton Master Fund LP, White Hawthorne, LLC, and White Hawthrone II, LLC.

nearly $30 billion in unsecured commercial bonds for two groups of collateralized bonds due in 2023 ("Brady Bonds"). These new collateralized bonds would move bad debt off of bank balance sheets and would allow Argentina's sovereign debt to trade in the secondary market.

One set of Brady Bonds ("Dollar Brady Bonds") was secured by non-marketable zero-coupon U.S. Treasury bonds ("Dollar Collateral") specially issued by the Treasury solely to collateralize the Dollar Brady Bonds. The other set of Brady Bonds ("DMK Brady Bonds") was secured by Deutsche Mark–denominated non-marketable zero-coupon bonds ("DMK Collateral") issued by the Kreditanstalt für Wiederaufbau, a German development bank.

2.    *The Agreements Governing the Brady Bonds*

After Argentina acquired the Dollar Collateral, it entered into two "fiscal agency agreements" with Citibank governing, among other things, the handling of payments on the Dollar Brady Bonds and the DMK Brady Bonds. Both fiscal agency agreements required Argentina and Citibank to enter into other agreements that would govern the Dollar and DMK Collateral (together, "Brady Collateral").

Among these other agreements, the "collateral pledge agreements" ("Dollar CPA" and "DMK CPA") required the Federal Reserve Bank of New York ("N.Y. Fed") to hold the collateral as the agent. The N.Y. Fed held the Dollar Collateral in accounts at its New York branch and held the DMK Collateral in accounts at the Bundesbank in Germany and the Bank for International Settlements in Switzerland.

The CPAs created the reversionary interests at issue here.  The Dollar CPA, for example, (1) granted the first-priority security interest in the Dollar Collateral to the N.Y. Fed on behalf of the Dollar Brady Bond holders; and (2) created mechanisms to terminate that interest and stated that upon such termination "all rights with respect [to the Dollar Collateral] shall revert to Argentina."  Joint App'x at 384-85.[2]  It is this right—to regain the collateral free and clear of the security interest under certain conditions—that Appellees sought to attach.

Over the past twenty years, we have twice approved the attachment of these same reversionary interests by creditors.  *See Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 223 (2d Cir. 2006); *Cap. Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 270 (2d Cir. 2011).

B.    Procedural History

In June 2021, Appellees obtained an *ex parte* order attaching Argentina's reversionary interests "in certain collateral accounts and collateral held in the custody of [the N.Y. Fed] arising out of Argentina's issuance of the Brady Bonds."  Joint App'x at 183.[3]  In August 2022, the district court confirmed orders of attachment and restraint against Argentina's reversionary interests in the Dollar Collateral.  Argentina appealed.  Appellees then discovered that the DMK Collateral was held in N.Y. Fed accounts in Germany and

---

[2] The DMK CPA contains similar provisions.

[3] All cites to the joint appendix throughout this opinion refer to the appendix submitted in Argentina's appeal of the district court's March 28, 2023 order.

Switzerland. So they first sought to clarify that their order of attachment on the Dollar Collateral applied to the DMK Collateral before eventually moving for a new order of attachment on the DMK Collateral. The district court granted that order of attachment on the DMK Collateral in March 2023.

The Brady Bonds and the bonds making up the Dollar and DMK Collateral also matured in March 2023. The N.Y. Fed liquidated the collateral and used the proceeds to pay the outstanding principal amounts owed to the Brady Bond holders. Argentina's reversionary interests entitle it to whatever remains of the collateral. The district court granted turnover of the reversionary interests to Appellees but stayed that order pending these appeals.

## II. STANDARD OF REVIEW

"We review *de novo* legal conclusions denying [Foreign Sovereign Immunities Act ("FSIA")] immunity to a foreign sovereign or its property." *NML Cap., Ltd. v. Republic of Argentina*, 680 F.3d 254, 256-57 (2d Cir. 2012). But we otherwise review a district court's ruling on a request for an order of attachment under the FSIA for abuse of discretion. *Id.* at 257. "A district court is said to have abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Id.* (cleaned up).

We similarly review a district court's turnover order for abuse of discretion. *See Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 95 (2d Cir. 2022).

## III.  DISCUSSION

Argentina argues that attachment of the reversionary interests was improper because (1) it does not own the reversionary interests and (2) even if it does own them, they are immune from attachment under the FSIA.  Neither argument has merit.

A.    Argentina Owns the Reversionary Interests

First, Argentina argues that it does not own the reversionary interests because they belong to its central bank, the Banco Central de la República Argentina ("BCRA").    Although we have twice concluded that these reversionary interests belong to Argentina, *see Cap. Ventures Int'l*, 443 F.3d at 223; *Cap. Ventures Int'l*, 652 F.3d at 270, Argentina seeks to relitigate the issue nearly twenty years after it was first decided.  In any event, its argument remains meritless.

Argentina argues as follows:  Section 3.03 of the Dollar CPA, which governs the distribution of the Dollar Collateral on the maturity date of the Dollar Brady Bonds,[4] provides that, if Argentina has fully paid the principal amount of the bonds, it must deliver to the N.Y. Fed a "Notice of Full Payment."   Joint App'x at 384.  The Dollar CPA defines "Notice of Full Payment" as "a duly completed notice from Argentina . . . stating that the principal of [the Dollar Brady Bonds] has been paid in full, *substantially in the form of Schedule K*."   *Id.* at 375 (emphasis added).  Schedule K is a form letter from Argentina to the N.Y. Fed informing the bank that the principal has been paid in full and directing it to transfer the Collateral "to account

---

[4] Argentina makes this argument only for the Dollar Collateral, but the terms of the DMK CPA are identical.

no. _____ of BCRA." *Id.* at 510. Argentina thus claims that (1) Schedule K directs payment to BCRA, and (2) the payment is owed on account of the reversionary interests, so (3) the reversionary interests that create entitlement to that payment must belong to BCRA.

There are two flaws in Argentina's reasoning. First, Schedule K is only a form notice. The actual "Notice of Full Payment" need only be "substantially in the form of Schedule K." *Id.* at 375. This formulation leaves flexibility to alter the recipient of the funds from BCRA to Argentina. Second, Argentina's interpretation of Schedule K is inconsistent with the agreement itself, which repeatedly states that "all rights" in the Collateral "shall revert to Argentina." *See id.* at 385. It would not make sense to read a single reference in a form schedule to override the language of the CPA.

We thus conclude that the reversionary interests belong to Argentina, not BCRA.

B.    <u>Attachment Under the Foreign Sovereign Immunities Act</u>

Argentina next argues that even if it does own the reversionary interests, they are immune from attachment under the FSIA. We disagree because Argentina's reversionary interests fall within the "commercial activity" exception to the immunity provided by the FSIA.

The property of a foreign state held within the United States is generally immune from attachment under the FSIA. *See* 28 U.S.C. § 1609. But that immunity is subject to several exceptions. Relevant here, section 1610(a) states that "[t]he property in the United

10

States of a foreign state, as defined in section 1603(a) of this chapter, *used for a commercial activity in the United States*, shall not be immune from attachment . . . if . . . the foreign state has waived its immunity from attachment." *Id*. at § 1610(a) (emphasis added). There is no dispute that Argentina has waived its immunity. Argentina has long acknowledged it has waived immunity from suit in connection with the bonds held by Appellees. *See NML Cap., Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 176 n.3 (2d Cir. 2011) ("The Republic concedes that in the Fiscal Agency Agreement governing the debt instruments owned by plaintiffs it clearly and unambiguously waived its right to assert its sovereign immunity from suit in claims regarding those instruments.").

So Argentina argues instead that it did not "use" the reversionary interest, that any use was not for a "commercial activity," and, with respect to the DMK Collateral only, that any commercial activity was not "in the United States." We disagree.

  1. *Argentina Used the Reversionary Interests in Commercial Activity*

Argentina used the reversionary interests in commercial activity at least twice before their current attachment. It argues that it never "used" the interests and that any use was not in commercial activity, but neither assertion has merit.

We have held that the word "used" in the text of section 1610(a) "require[s] not merely that the property at issue relate to commercial activity in the United States, but that the sovereign actively *utilize* that property in service of that commercial activity." *Exp.-Imp. Bank of the Rep. of China v. Grenada*, 768 F.3d 75, 90 (2d Cir. 2014). The inquiry

11

focuses on use at the time the writ of attachment or execution is issued. *Id.* at 84. (citing *Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009)). But the property need not be actively utilized at the moment of attachment. Instead, it "must *have been used* for a commercial activity at the time the writ of attachment or execution is issued." *Aurelius Cap. Partners*, 584 F.3d at 130 (quotation marks omitted) (emphasis altered).

Here, after a 2001 default, Argentina offered to exchange the defaulted Brady Bonds and other defaulted bonds for "proceeds of the collateral securing them plus new debt that Argentina would issue." *Cap. Ventures Int'l*, 652 F.3d at 268. To do so, Argentina relied on a provision in the CPAs that allowed it to "receive the collateral, liquidate it, and pay its proceeds to the Brady bondholders." *Id.* Its receipt of that collateral would be through the reversionary interests in the Dollar and DMK Collateral.

So to avoid attachment of the proceeds from the collateral right after it was liquidated but before it was transferred to bondholders, Argentina entered into a new "Continuation of Collateral Pledge Agreement." *See id.* at 268-69; *see also* Joint App'x at 182-93, *Cap. Ventures Int'l v. Republic of Argentina*, No. 10-4520 (2d Cir. Nov. 17, 2010), ECF No. 56-3 ("CVI Joint App'x"). That agreement required Argentina to file a Request for Release of Principal Collateral with the N.Y. Fed. But the Continuation of Collateral Pledge Agreement provided that "all rights with respect to such Principal Collateral shall not revert to Argentina but shall be subject to a continuous lien in favor of the [N.Y. Fed] for the ratable benefit of" the bondholders. CVI Joint App'x at 184. While Argentina thus retained its ability

12

under the CPAs to liquidate the collateral by redeeming or exchanging the Brady Bonds, it would not receive the proceeds of that liquidation.  Instead, once the collateral was liquidated, the proceeds transferred to the Brady Bond holders rather than to Argentina.  *See id.*  Roughly $62.3 billion in bonds were exchanged, including $2.8 billion in Brady Bonds, as part of this offer.  *Cap. Ventures Int'l*, 652 F.3d at 269. [5]

In short, the Continuation of Collateral Pledge Agreement reflects the fact that Argentina's reversionary interests were part of the exchange offer that was valuable to bondholders, as was Argentina's offer to modify them.

Second, Argentina made another exchange offer in 2010 for roughly $100 million.  Brady Bond holders were initially excluded, but Argentina tried to modify the prior attachment of its reversionary interests to include the Brady Bonds in the offer.  It sought permission to transfer a pro rata share of the Brady Collateral directly to tendering bondholders.  *See Cap. Ventures Int'l*, 652 F.3d at 269.  This Court rejected that effort because the existing attachment of the reversionary interests prohibited the exchange from going forward with respect to Brady Bond holders.  *See id.* at 273.  Argentina thus offered to alter its reversionary interests to include Brady Bond

---

[5] Although the Continuation of Collateral Pledge Agreement prevented attachments that would impede the exchange offer, a creditor, Capital Ventures International, successfully attached the reversionary interests after the exchange offer concluded.  *See Cap. Ventures Int'l*, 443 F.3d at 223.

holders in the exchange.  And the reversionary interests ultimately forced Argentina to alter the terms of its exchange offer.

The reversionary interests gave Argentina rights in the collateral that were valuable to both its creditors and its bondholders. Argentina twice offered to alter or extinguish the reversionary interests to incentivize bondholders to participate in its exchange offers.  Thus Argentina used the reversionary interests in these transactions.[6]

Argentina argues that these uses were not for commercial activity because the Brady Bonds were issued as part of the Brady Plan, which was open only to sovereigns, and that it participated in the Plan only to further "intergovernmental policy objectives."  We are unpersuaded.  Although the Brady Collateral was available only to sovereigns, once Argentina obtained that collateral, it issued ordinary collateralized bonds on the open market.  The 2005 and 2010 exchange offers likewise were commercial bond offerings, and the

_____

[6] Argentina also argues that the reversionary interests cannot be attached while the Brady Bonds are in default because Argentina itself cannot exercise the interests.  It cites our decision in *Capital Ventures International v. Republic of Argentina*, which held that a judgment creditor could not obtain excess collateral for the Brady Bonds in part because the CPA barred Argentina from receiving the collateral while the bonds were in default.  280 F. App'x 14, 15-16 (2d Cir. 2008) (summary order).  This argument confuses the reversionary interests with the collateral itself. Whether Argentina can *exercise* the reversionary interests and gain access to excess collateral is separate from the question whether a creditor can attach those interests.  The interests may be "used" and attached without being exercised.

fact that they were made by Argentina does not convert them into sovereign activity.

The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). "[A] foreign state engages in commercial activity 'when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it.'" *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 176 (2d Cir. 2010) (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992)). As this Court has explained, "a state engages in commercial activity under the FSIA where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns. Put differently, a foreign state engages in commercial activity for purposes of the FSIA only where it acts in the manner of a private player within the market." *Id.* at 176-77 (cleaned up) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)). It is thus the nature of the act, not its purpose, that matters in evaluating commercial character. "[T]o determine the nature of a sovereign's act, we ask not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives but rather whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (cleaned up) (quoting *Weltover*, 504 U.S. at 614).

To determine whether property is "used for a commercial activity," we adopt a totality-of-the-circumstances approach. *See, e.g.,*

*TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 785-88 (D.C. Cir. 2020) (discussing the approaches used by the Third, Fifth, and Ninth Circuits and adopting a similar approach). We examine "the uses of the property in the past as well as all facts related to its present use, with an eye toward determining whether the commercial use of the property, if any, is so exceptional that it is an out of character use for that property." *Id.* at 786 (quoting *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 369 (5th Cir. 2004)); *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 150 (3d Cir. 2019) (adopting the same test). As relevant here, the totality-of-the-circumstances inquiry prevents a judgment creditor from attaching sovereign property by pointing to sporadic commercial uses inconsistent with the typical uses of the property. But it also prevents a sovereign from defeating attachment by using property in occasional non-commercial activity. *See TIG Ins.*, 967 F.3d at 786 ("[A]n artificially narrow lens allows one-time or aberrational uses to dictate the fate of the property.").

It does not matter, and we do not decide, whether Argentina's purchase of the Brady Collateral was a sovereign, rather than commercial, activity because Argentina's acquisition of the Brady Collateral is not the transaction at issue. The focus of our inquiry is not the Brady Collateral itself, but Argentina's reversionary interests in that collateral. Those reversionary interests did not exist when Argentina bought the collateral, so they could not have been "used" in that transaction. It follows that the commercial or sovereign nature of Argentina's use of the reversionary interests cannot depend on the characteristics of a deal that closed before they existed.

Argentina tries to elide this distinction by collapsing two separate transactions into one.  In the first, Argentina bought bonds from the Treasury and the Kreditanstalt für Wiederaufbau, an arguably sovereign activity.[7]  But in the second, it used those bonds to collateralize its own Brady Bonds in the same way any other market participant would create a collateralized bond.  How Argentina came to acquire that collateral in this specific instance has no bearing on the nature of the second transaction.[8]

_____

[7] In *EM Ltd. v. Republic of Argentina*, we held that the FSIA did not allow Argentina's creditors to attach certain funds held in a N.Y. Fed account just because they could be used to repay Argentina's debt to the International Monetary Fund ("IMF").  473 F.3d 463, 481-85 (2d Cir. 2007).  Argentina's relationship with the IMF wasn't "commercial" for several reasons.  First, "when [Argentina] borrows from the IMF, it exercises powers peculiar to sovereigns."  *Id.* at 482 (cleaned up).  Second, Argentina's "borrowing relationship with the IMF is regulatory in nature" because borrowing from the IMF "generally requires regulatory action."  *Id.* at 483.  Third, "the terms and conditions of [Argentina's] borrowing relationship with the IMF are not governed by a garden-variety debt instrument, but instead by [its] treaty obligations to the international organization, as supplemented by the terms and conditions contained in agreements associated with individual loans."  *Id.* at 483-84 (cleaned up).  And fourth, "IMF loans are structured in a manner unique to the international organization, and are not available in the commercial market."  *Id.* at 484.  Argentina's receipt of the Brady Collateral—which only a sovereign could obtain—thus bears some resemblance to its receipt of IMF funds.  But again, that transaction is not the focus of our inquiry here.

[8] Nor did the collateralization of the Brady Bonds necessarily depend on the specific bonds used as Brady Collateral.  Sections 6.03 and 6.04 of the CPAs allowed Argentina to substitute the Brady Collateral for other

That second transaction—Argentina's issuance of sovereign bonds—involved "garden-variety debt instruments" that "may be held by private parties; . . . are negotiable and may be traded on the international market . . . ; and . . . promise a future stream of cash income." *Weltover*, 504 U.S. at 615.  It was thus commercial activity under the FSIA.  *Id.*  And if that transaction was commercial, so too were the 2005 and 2010 exchange offers.  Neither exchange offer depended on the fact that the underlying collateral was a special Treasury bond available only to sovereigns.  Both involved an offer to exchange old debt for new, as any non-sovereign entity might do.

Under the totality of the circumstances here, Argentina's uses of the reversionary interests have been commercial in nature.  And in light of the history of these reversionary interests—including this Court's rejection in 2011 of Argentina's attempted use in *Capital Ventures International*, 652 F.3d at 270—we conclude that they are attachable.

2.    *The Commercial Activity Was in the United States*

Argentina's next argument against attachment concerns only the reversionary interests in the DMK Collateral.  It argues that no use of a reversionary interest occurred "in the United States" because the DMK Collateral is in Germany and no transaction involving that collateral occurred in the United States.  Appellees respond that the relevant inquiry is where the reversionary interests—not the DMK Collateral—are located.  And an intangible property interest, they

---

collateral and then exercise the reversionary interest.  So the CPAs did not require the Brady Bonds to be collateralized by the Brady Collateral.

argue, is located where the party from which performance is required is located.  That party here is the N.Y. Fed. in New York.  Finally, they point to the 2005 and 2010 exchange offers as uses of the interest in the United States, though they maintain that the relevant inquiry is only the location of the reversionary interests.

The FSIA requires that the attached property be in the United States *and* that the use of that property in commercial activity occur in the United States.  *See* 28 U.S.C. § 1610(a) (permitting attachment of "[t]he property *in the United States* of a foreign state . . . used for a commercial activity *in the United States*." (emphases added)); *see also Exp.-Imp. Bank of the Rep. of China*, 768 F.3d at 79 ("[U]nder some circumstances, the FSIA permits a creditor to execute a judgment against assets of a foreign sovereign if the assets are in the United States when attached *and* are used for a commercial activity in the United States." (quotation marks omitted) (emphasis added)).  Both requirements are satisfied here.

First, Argentina's argument focuses on the wrong property interest.  The question is where Argentina's reversionary interests in the DMK Collateral are located, not the collateral itself.  The parties agree that the default rule is that the relevant location of intangible property is the situs of the property.  For a contractual right like the reversionary interests, the situs is the location of the party "upon whom rests the obligation of performance."  *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 675 (1976).[9]  Here, that party is the

---

[9] We assume that New York law—not federal law—provides the relevant test for locating the situs of the reversionary interests because they

N.Y. Fed as collateral agent, which is tasked with returning any excess Brady Collateral to Argentina upon the exercise of the reversionary interests.  Argentina responds that there is an exception to the general rule for the location of intangible property where "'intangibles are deemed to have become embodied in formal paper writings, e.g., negotiable instruments' at which point 'attachment depends on the *physical presence of the written instrument* within the attaching jurisdiction.'"  Appellant's Br. II at 28 (quoting *ABKCO Indus.*, 39 N.Y.2d at 675).  And here, the DMK Collateral consists of negotiable instruments—bearer bonds—located outside New York.  But this argument again confuses the object of attachment—the reversionary interests in the collateral, not the collateral itself.  The reversionary interests were created by the CPAs.  *See ABKCO Indus.*, 39 N.Y.2d at 675 ("No fact of physical location or concept of embodiment applies, however, to intangible property in an ordinary contract, written or oral.").  The location of the collateral thus does not determine the location of the reversionary interests.  Instead, the reversionary interests are located within the United States—in New York State— where the N.Y. Fed is located.

---

are creatures of contracts governed by New York law**.**  *See Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014) (stating that the FSIA takes property interests as it finds them—defined by state law).  *But see Af-Cap Inc.*, 383 F.3d at 371-72 (employing a situs test not tied to the law of any one state when analyzing property's location under the FSIA).  We need not resolve this question because the result is the same either way.  The situs of the reversionary interests is New York.  *See Af-Cap Inc.*, 383 F.3d at 371 (applying a "common sense appraisal of the requirements of justice and convenience" to determine that the situs of intangible tax and royalty obligations was the location of the garnishee).

Second, the commercial activity in which Argentina used the reversionary interests took place at least in part in the United States. Both the 2005 and 2010 exchange offers were made in the United States and registered with the Securities and Exchange Commission.

*        *        *

Argentina used the reversionary interests as part of its exchange offers in 2005 and 2010. That use was commercial activity in the United States. The reversionary interests thus are not immune from attachment under the FSIA, and we affirm the district court's orders of attachment.

C.    Turnover

Argentina next argues that its reversionary interests are not subject to turnover. New York law allows for the turnover of property in the possession or custody of someone other than the judgment-debtor "where it is shown that the judgment debtor is entitled to the possession of such property." N.Y. C.P.L.R. 5225(b). The district court granted Appellees' motion for turnover of Argentina's reversionary interests in the Dollar and DMK Collateral but stayed the turnover pending this appeal.

Argentina makes three main points. First, the reversionary interests cannot be turned over because they were improperly attached. Having affirmed the attachment of the reversionary interests, we reject this argument. Second, the reversionary interests in the DMK Collateral cannot be turned over because the N.Y. Fed does not have "possession or custody" of the DMK Collateral. This argument again elides the differences between Argentina's

reversionary interest in the DMK Collateral and the DMK Collateral itself.

Third, Argentina argues that it is not a "judgment debtor" for purposes of C.P.L.R. 5225. New York law defines that term as "a person . . . against whom a money judgment is entered." C.P.L.R. 105(m). Argentina argues that it is not a "person" and so not a "judgment debtor" because there is a presumption under New York law that the term "person" does not include sovereigns. *See In re Fox*, 52 N.Y. 530, 535 (1873) ("The word person does not, in its ordinary or legal signification, embrace a State or government[.]").

But that is an oversimplification. New York law does not always use "person" so narrowly, and the term is sometimes used "in its enlarged sense" to encompass sovereigns. *Republic of Honduras v. Soto*, 112 N.Y. 310, 312-13 (1889) (holding that a sovereign was a "person" under a former procedural statute). The appropriate usage depends on "the objects [the statute] had in view, the evils intended to be remedied, and the benefits expected to be derived from it." *Id.* at 313.

It would make little sense if the term "person" excluded sovereigns in this context. The C.P.L.R. often refers to "persons" in procedural rules that apply to all parties, including sovereign entities. *See, e.g.*, C.P.L.R. 1001-1002 (necessary and permissive joinder); C.P.L.R. 1013 (permissive intervention); *see also Swezey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 19 N.Y.3d 543, 550-52 (2012) (holding that the Republic of the Philippines was a necessary party under C.P.L.R. 1001(a)). Interpreting "person" to exclude sovereigns here would cut them out of a normal part of civil litigation—judgment

enforcement—because the C.P.L.R. also defines a "judgment creditor" using the term.   C.P.L.R. 105(*l*) (defining "judgment creditor" as "a person in whose favor a money judgment is entered or a person who becomes entitled to enforce it"); *see also Commonwealth of Northern Mariana Islands v. Canadian Imperial Bank of Comm.*, 21 N.Y.3d 55 (2013) (interpreting C.P.L.R. 5225(b) after a foreign government initiated turnover proceedings under that section). Argentina points to no authority indicating that New York has sought to bar foreign sovereigns from enforcing judgments in its courts or any plausible reason for doing so.

We affirm the district court's turnover orders.

D.   Motions

Lastly, there are two outstanding motions before this Court. First, Argentina moved to supplement the record of the first appeal to include proceedings related to the DMK Collateral that occurred after that appeal was filed.   Those materials entered the record in the second appeal.   The motion is now moot, so we deny it.

Second is a motion filed by intervenor Bainbridge Fund Ltd seeking greater access to the myriad sealed and redacted filings in this case.   On January 4, 2023, we entered an order requiring that "[a]ny sealings and redactions made by the parties . . . be 'narrowly tailored to achieve' the purpose of sealing, as to documents subject to the First Amendment right of access, and . . . reflect a weighing of the presumption in favor of access 'against countervailing interests favoring secrecy[,]' as to documents to which only the common law right of access applies."   Dkt. 145 at 2 (quoting *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 165 (2d Cir. 2013)).   Bainbridge moves to

enforce the terms of that order, arguing that the parties' sealing is not narrowly tailored.  That motion is granted.

Two rights of access can apply to materials in a civil action.  The first, under the First Amendment, "applies to civil trials and to their related proceedings and records."  *Newsday LLC*, 730 F.3d at 163 (quotation marks omitted).  That includes "among other things, [the] summary judgment motions and documents relied upon in adjudicating them, pretrial motions and written documents submitted in connection with them, and docket sheets."  *Id.* at 164 (citations omitted).  The First Amendment creates a presumptive right of access that can be "overcome by specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim."  *Id.* at 165 (quotation marks omitted).

When the First Amendment protection doesn't apply to court records, the second, common-law right "attaches with different weight depending on two factors: (a) the role of the material at issue in the exercise of Article III judicial power and (b) the resultant value of such information to those monitoring the federal courts."  *Id.* (quotation marks omitted).  The right is "balanced against countervailing interests favoring secrecy."  *Id*.  Thus, under either analysis, parties must have a valid reason to seal materials.

Appellees sought to seal the case below "to protect against . . . another creditor finding out what we're doing and then trying to jump the line ahead of us if for some reason there were a delay in the marshal's effecting service of the attachment order."  Joint App'x at 918-19.  The district court then granted the parties' joint

sealing motion "because of the sensitivity of the financial information and the [settlement] negotiations." *Id.* at 923.

At oral argument, the parties confirmed that they had not been engaged in settlement negotiations for some time. Those negotiations no longer provide a reason to seal materials here. Moreover, any interest that Appellees had in preserving the secrecy of their efforts to attach the assets at issue has waned because the orders of attachment—and turnover—have already issued. As Appellees told the district court, "there would be no need . . . to maintain the seal and the documents could become part of the public record" "once the levy is established." *Id*. at 918.

That leaves only any sensitive financial information. It is unclear which information, if any, should remain sealed on this basis. For that reason, the parties shall refile their sealed materials within thirty days, redacting *only* material containing sensitive financial information.

## IV. CONCLUSION

Argentina used its reversionary interests for commercial activity in the United States just like any other commercial actor. It cannot now invoke the FSIA to avoid the consequences of that decision. The reversionary interests are both attachable and subject to turnover.

The orders of the district court are affirmed, the motion to supplement the record is denied as moot, and the motion to unseal is granted.